# Rubén Martínez Rodríguez, known as Gallego, Petitioner, v. Gerardo Delgado, Warden, etc., Respondent.

No. HC-64-21.  Decided June 30, 1965.

*López Carrillo & Cruz* for petitioner. *J. B. Fernández Badillo,*

*Solicitor General,* and *J. F. Rodríguez Rivera, Assistant Solicitor General,* for respondent.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

A law of the state of California, West's Annotated Health and Safety Code, § 11721 (1964 ed.), made addiction to the use of narcotic drugs a public offense punishable by imprisonment in jail. It having been shown that the person was an addict to the use of drugs, he violated the law without the need of establishing specific acts such as use, possession, or transportation. Its constitutional validity was assailed. In *Robinson* v. *California,* 370 U.S. 660 (1962), the Supreme Court of the United States, considering that being addicted to the use of narcotic drugs apparently is an illness, held that the criminal conviction of a person merely for being an addict was a cruel and unusual punishment and, hence, prohibited by the Eighth Amendment.

Relying on that decision, petitioner requests this Court to release him.[1] Let us examine his reasoning. On May 17, 1961, he was charged with having in his possession and control the narcotic drug known as marihuana.[2] The trial was held and he offered no evidence in his defense. On the following September 15 he was sentenced to serve from 6 to 10 years' imprisonment in the penitentiary. Three years later, September 23, 1964, he requested his release alleging

---

[1] Petitioner had been previously convicted in the Federal District Court for the District of Puerto Rico for the crime of selling drugs, and he was on probation.

[2] The provision violated is the following:

"There is hereby absolutely forbidden the holding, possession, conveyance, use, application, prescription, manufacture, preparation, or any transfer or receipt, as well as the introduction, concealing, and transportation in Puerto Rico of:

".    .    .    .    .    .    .    .

"(3) The drug known as marihuana, as well as any liquid or solid mixture, including cigarettes or cigars of whatever form and nature containing any portion of residue of marihuana." (24 L.P.R.A. § 974z.)

that he is an addict "afflicted with a disease marked by an irresistible craving for the use of drugs, wherefore both the trial and the sentence are null and void at law since an offense could not, nor can it ever be established in the absence of criminal intention, and that his conviction would amount to prosecuting or punishing a person for being afflicted with cancer or tuberculosis." He then cites from the *Robinson* case the following:

"It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments."

The State alleges that petitioner did not show at the trial against him that he was an addict. *Robinson* did not establish when the habitual use of narcotics becomes a disease. Note, 111 Pa. L. Rev. 122, 124 (1962). We shall assume, however, that petitioner established that he is a sick person.[3]

■ Although it is true that *Robinson* held that the infliction of a prison punishment by virtue of a judgment in a criminal case on an addict to the use of narcotic drugs merely because he is such an addict is a cruel and unusual punishment, it is also true that the Court clearly established

---

[3] At the hearing of the habeas corpus petitioner admitted being an addict to the use of narcotic drugs; that he had a craving for drugs. There was also evidence that he was receiving group treatment in the penitentiary. Dr. Fernández Marina's testimony merely stated in general terms the addict's symptomatology. He did not examine petitioner. Whether this is sufficient to establish the condition of addict as a "disease," *quaere*.

that a "State might impose criminal sanctions, for example, against the unauthorized manufacture, prescription, sale, purchase, or possession of narcotics within its borders." And in considering the question it makes clear that "this statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for anti-social or disorderly behavior resulting from their administration. . . . Rather, we deal with a statute which makes the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.' " And at the end the majority opinion asserts:

> "We are not unmindful that the vicious evils of the narcotics traffic have occasioned the grave concern of government. There are, as we have said, countless fronts on which those evils may be legitimately attacked. We deal in this case only with an individual provision of a particularized local law as it has so far been interpreted by the California courts."

Thus, in *Robinson* it was made clear that what was repugnant to the constitutional guarantee consecrated in the Eighth Amendment was the infliction of criminal punishment on a person solely for being an addict. Punishment was being inflicted, not for an "act," but for a "status." In considering the question, the Court emphasized that the State could use diverse means to control the traffic and use of drugs. It could punish the possession of the drug, its sale, its purchase, and other activities relating to the traffic of narcotic drugs.

■ Petitioner's interpretation of *Robinson* is that it maintains that a jail punishment on an addict for possessing a narcotic drug is a cruel and unusual punishment. *Robinson* does not hold that. The Court made it clear that it did not. It said at p. 664 that "a State might impose criminal sanctions, for example, against the unauthorized manufacture, prescription, sale, purchase, or possession of narcotics within its borders."

■ There is nothing in the ruling which holds "that the fact of being a drug addict may be a valid defense in favor of the addict when he is caught making 'use, possessing, or transporting a drug, if such operations are incidental to its proper use.' "

That is not the construction placed upon *Robinson* by the courts of other jurisdictions having statutes like ours. Regarding the comments on the holding, the majority is agreeable with the construction of the courts. Some say that it is logical and reasonable to extend the doctrine to specific acts to the effect that the criminal conviction of an addict for using or possessing narcotic drugs is a cruel and unusual punishment. Let us examine first the case law, then the comments.

On June 30, 1964, the Supreme Court of Wisconsin rendered judgment in *Browne* v. *State*, 129 N.W.2d 175, which was ratified six months later in *State* v. *Brown*, 130 N.W.2d 760. The constitutionality of a statute which punished the use of drugs without a prescription was assailed. The information was based on the fact that defendant used an unprescribed drug. He invoked *Robinson* and set up the defense that he was an addict. The court upheld the validity of the statute and affirmed the judgment sentencing him to serve a maximum penalty of five years. In so holding, it said:

"Robinson is clearly distinguishable. The California statute that was held unconstitutional made it a crime to be a drug addict. Robinson came to California from Oregon and was charged with the status crime of being addicted to the use of narcotics. He was not charged with, nor was there any evidence offered of any particular incident of use of drugs either in California or otherwise. . . .

"Robinson does not invalidate any state statute . . . that makes it a crime for a person, whether an addict or not, to take and use narcotic drugs without a legal prescription. In the case at bar Browne was not charged with being an addict but

with a specific act of taking and using drugs not pursuant to a prescription."

In *Salas* v. *State*, 365 S.W.2d 174 (1963), another phase of the question under consideration was before the Court of Criminal Appeals of the State of Texas. The statute makes it a crime (1) to habitually use narcotic drugs, (2) to be addicted to, and (3) to be under the influence of narcotic drugs. Salas was charged with being under the influence of narcotic drugs. He attacked the constitutionality of the statute in the light of the holding in *Robinson*. The Court held that that part of the statute, insofar as it makes it a crime for a person to be addicted, is invalid. Subsequently it ratified this holding in *Ex parte Rogers*, 366 S.W.2d 559 (1963), and in *Martínez* v. *State*, 373 S.W.2d 246 (1963), but sustained the remainder of the statute. These cases conclude that being under the influence of narcotic drugs is an act which may be punished criminally. Defendant appealed to the Supreme Court of the United States, and his case was dismissed for want of substantial federal question. *Salas* v. *Texas*, 375 U.S. 15 (1963).

In *Martínez* the Court of Texas, after *Robinson* was invoked, stated the following:

"The cases cited furnish no authority for striking down the statute which provides life as the maximum punishment for the unlawful possession of a narcotic drug."

In *State* v. *Margo*, 191 A.2d 43 (1963), the Supreme Court of New Jersey had under consideration the same question raised in *Salas* which we have just considered. In deciding the same, it stated as follows:

"Our statute does not punish for an unsatisfied craving for drugs. Rather it denounces the state of being under their influence. As we have said, the statute deals with the influence of narcotics to obviate an issue as to whether the drug was taken here or in another jurisdiction. We see no reason why, if a person may constitutionally be punished for using a drug, he

may not be punished for being under its 'influence,' for realistically the use of a drug offends society's interests precisely because of its baleful influence upon the person and the harm to which that influence may lead. In other words, being under the influence of a drug is itself antisocial behavior. It is not some latent or passive proclivity; it is an active state, voluntarily induced and laden with a present capacity for further injury to society. We think society may use the criminal process to protect itself against that harm. Robinson is not to the contrary."

In *Murray* v. *State*, 203 A.2d 908 (1964), the Court of Appeals of Maryland considered another phase of the question. Murray was charged with possession of narcotics. Relying on *Robinson*, he offered medical evidence to establish that addiction is a disease, and it was excluded. On appeal, the trial court was upheld. The following is the expression of the Court:

"In Maryland narcotics addiction is not a crime, and the defendant was not prosecuted for being an addict. Instead, he was tried and convicted of a violation of Code (1957), Art. 27, § 277, which prohibits one from manufacturing, possessing, controlling, selling, prescribing, administering, dispensing, or compounding any narcotic drug unless authorized by law to do so, and it is for possessing and controlling narcotics that the defendant is being punished. While the multiple offender statute, Code (1964 Supp.), Art. 27, § 300, applies to addicted and non-addicted alike, it does not, as the defendant claims, punish one for being an addict. Moreover, despite the apparent election of the defendant to ignore it, the law provides for the treatment, care and confinement of one charged with the commission of a criminal offense 'who is habitually addicted to the use of narcotic drugs as that term is defined in § 276 of Article 27.' Code (1964 Supp.), Art. 16, § 49. This statute does not make narcotics addiction a crime, nor is it punitive in nature.

"The Robinson case, holding that a California statute that punished one for drug addiction was in violation of the constitutional guarantee against cruel and unusual punishment, is clearly distinguishable from the present case. There the statute

in question specifically made it unlawful for a person to be addicted to the use of narcotics. In Maryland, as we have seen, there is no statute making addiction a crime."

In *State* v. *DaVila*, 183 A.2d 852 (Conn. 1962), the defendant was convicted of having in his possession a narcotic drug: heroin. He admitted being an addict and purchasing the drug for his own use. The State offered evidence to prove that defendant became acquainted with one Leach, with whom he smoked marihuana. They discussed narcotics and defendant offered to sell some to Leach, who stated that he had a friend who would be interested. Defendant told Leach that he was going to New York to obtain narcotics which he desired to dispose of through Leach. The following day defendant returned, with 10 bags of heroin, to his apartment, where Leach met him by prearrangement. They then went to a car. After being introduced, defendant sold nine of the bags to a man who turned out to be a federal agent. Defendant did not want to sell the tenth bag because he wanted it for a friend. Defendant admitted the foregoing, but claimed that Leach induced him to do so and that he kept the last bag for his own use.

The defendant requested the trial court to charge that if the jury found that the drug was in his possession for purposes of administration to himself who was an addict, the jury should so indicate in their verdict. The court did not so charge. On appeal, it was held that it was correct.

The Connecticut statute provides that "no person shall manufacture, possess, have under his control, sell, prescribe, dispense, compound, administer to himself or to another person, or be addicted to the use of any narcotic drug."

In holding that the court was correct in refusing the instruction requested, the Court said that the law makes no distinction "between possession or control of the drug for sale and possession or control for self-administration or by one who is an addict. A person who has the drug in his

possession or under his control for any purpose other than a lawful one as described in the uniform act is guilty of a crime."

The Supreme Court of Louisiana was confronted with the problem presented in the *Robinson* decision, holding that "inasmuch as the habitual use of a narcotic as denounced by the Louisiana statute necessarily comprises a series of acts committed intentionally or voluntarily, our law can and could have no application in the prosecution of a person for the mere status or condition of addiction which might possibly, as pointed out by the various opinions in the *Robinson* case, result unintentionally or involuntarily. And since the federal decision declared the California statute invalid solely because of such a possibility that holding is not controlling, or even relevant, in a determination of the constitutionality of LRS 40:962(A) under which these relators were charged." *State* v. *Walker*, 154 So.2d 368 (1963), *cert. denied*, 375 U.S. 988 (1964). And in *State* v. *James*, 169 So.2d 89 (1964), it is held that since defendant was not charged with addiction but with possession of morphine, he had no standing to attack the constitutionality of the addiction provisions of the statute.

A statute similar to that of California was construed in *People* v. *Davis*, 188 N.E.2d 225 (Ill. 1963). And the Supreme Court of Illinois, on the theory of *Robinson*, held that it was unconstitutional to convict a person for being an addict.

In *State* v. *Bridges*, 360 S.W.2d 648 (Mo. 1962), the question involved was the same. The Supreme Court of Missouri held that the legal provision punishing "to be or become addicted to any narcotic drug" was void, as was the statute construed in *Robinson*.

On April 21 past the Court of Appeals for the Second Circuit decided *United States* v. *Reincke*, 344 F.2d 260. One convicted for the use of drugs filed a petition for habeas

corpus alleging that since he was an addict, his criminal conviction for the use of drugs was a cruel and unusual punishment. He invoked *Robinson*. In denying the writ the court said that in *Robinson*:

". . . The Court recognized 'the broad power of a State to regulate the narcotic drugs traffic within its borders,' affirmed the power of a state to 'impose criminal sanctions' against unauthorized 'possession of narcotics within its borders,' 370 U.S. at 664—without drawing an exception for addicts—and emphasized that it was dealing 'only with an individual provision of a particularized local law as it has so far been interpreted by the California courts.' 370 U.S. at 668."

We turn next to examine the comments published about *Robinson*. In a note appearing in 12 Buffalo L. Rev. 605 the following is stated at p. 620:

"The dissenting opinion of Mr. Justice White has, however, touched upon a point that is certain to present itself to the Court for future resolution and perhaps eventual extension of the scope of the instant ruling. It is simply this: if a state cannot punish for the status or condition of drug addiction, how consistent with the Eighth Amendment stricture will be those statutes that proscribe the *use* of drugs? It is apparent that an addict uses drugs because he is *addicted* to their use. For the same reason he will *possess* narcotics as well as the instruments for their use and may perhaps even *sell* narcotics to other addicts to support his own habit. He will use, possess, and sell narcotics only because he is addicted to them, because he has the status of being an addict, a state or condition which cannot now be punished.

"It may be enough to say that all of these elements are severable and that the inability of the states to constitutionally proscribe the status of drug addiction will not affect the constitutionality of the incidents thereof."

In 42 Neb. L. Rev. 685–91 (1962) it is made clear that *Robinson* "raised, but did not answer, the question of whether a person could be convicted for the use of narcotics."

In a study of the decisions of the Supreme Court annually made in Har. L. Rev. the following comment on *Robinson* appears in vol. 76 at p. 143 *et seq.*:

". . . The majority emphasized that the decision did not preclude punishment for the related offenses of 'unauthorized manufacture, prescription, sale, purchase, or possession of narcotics,' or compulsory civil confinement of addicts for treatment.

".

". . . However, as Mr. Justice White emphasized, the majority opinion appears broadly to assume that any habitual user of drugs, the trial court's definition of an addict, is necessarily an addict in the medical sense, who acts under physical and psychological compulsion. As he also pointed out, the majority's catalogue of acts which a state constitutionally may punish did not include the use of narcotics. While this list clearly was not exhaustive, a distinction between penalties for use and penalties for addiction appears tenuous, at least where addiction is regarded as no more than habitual use. The principal difference would seem to be the degree of particularity required in the indictment and the necessary proof of such matters as time and place of use. Moreover, even if the majority holding does not require elimination of use as a separate offense, it is at least arguable that it indicates that a defendant should be permitted to interpose addiction as a defense to a prosecution for use, since otherwise the state would seem to be punishing addiction indirectly. The same might sometimes be true of the offense of illegal possession. That the majority opinion meant to go so far, however, seems doubtful, since Mr. Justice Stewart emphasized that the present case is not considered to have involved a punishment for any antisocial acts. Mr. Justice Harlan also stressed the distinction between an act and a condition or status as the basis for criminal sanctions—a distinction which others have thought constitutionally significant. Adoption of such an analysis might cast doubt on the constitutionality of the numerous statutes prohibiting such 'crimes of personal condition' as vagrancy, which in many jurisdictions is punishable on proof that the defendant was an 'idle' or 'dissolute' person, rather than on proof of specific antisocial behavior.

"The decision would seem at least to bar prosecution where the state is unable to prove any specific instance of use or possession of narcotics within the jurisdiction."

In the note commenting *Robinson* appearing in 37 Tul. L. Rev. 119, 121 (1962), it is said:

"The decision in the instant case notwithstanding, the addict remains outside the law for all practical purposes. By using, possessing, or purchasing narcotics, he is engaging in extralegal activity."

And in that appearing in 47 Minn. L. Rev. 484, 493 (1963), it is asserted:

". . . If the Court is willing to grant the *status* of addiction immunity on the basis of its similarity to mental illness, there appears to be no logical reason why that similarity should not also be recognized for the purpose of granting the addict immunity from prosecution for acts *incidental* to his condition. Thus, the Court's reasoning suggests that the status of narcotic addiction ought to be recognized as an affirmative defense in criminal actions for acts incidental to that status."

In the Note published in 16 Vand. L. Rev. 214, 218 (1962) it is commented:

"Although the Court expressly limited its holding to those statutes which make a criminal offense of the addict's status, its reliance upon the substance of the eighth amendment tends to broaden the effect of the holding to include statutes which subject the addict to criminal prosecution because of an act essential to his status. The use of the eighth amendment raises the question of whether it would be any less cruel and unusual to imprison an addict for acquiring, possessing, or using narcotics. Logic dictates a negative answer."

In 41 Texas L. Rev. 444, 446 (1963) it is asserted that: "if the constitutional ban on cruel and unusual punishment precludes treating the addict as a criminal, then it makes no sense to permit the states to treat as criminal the conduct of an addict which is only symptomatic of his disease."

In an article entitled *Implications of Robinson* v. *Califor-*

*nia*, 1 Houston L. Rev. 1, 7 (1963), a study is made of the holding as well as of others of state courts, especially *State v. DaVila, supra*, of the Supreme Court of Connecticut. It concludes thereon that "while the decision of the *Robinson* case does not compel any certain result, and the decision of the Connecticut Court seems unduly restrictive, it may be suggested with some confidence that the law will be that an addict may not be jailed for the crimes of narcotic condition."

The author is of the opinion that the implication of *Robinson* is that "where the addict violates the narcotics law by obtaining, using, or possessing the drug in order to maintain his habit, the state can not impose jail sentence on him."

■ Thus, we see that the courts have unanimously construed *Robinson* in the sense that a criminal sanction may be imposed on an addict if he commits one of the acts prohibited by law.

However, the opinions of those who have commented on the decision, the students who write the notes and those who comment on them as well, are diverse. Some say that they are agreeable with the reasoning of the opinion to the effect that the State may impose a criminal punishment on an addict for using, possessing, etc., the narcotic drug. Others admit that that is the tenor of the decision, but that it is neither logical nor reasonable. Others maintain that the final result of the holding is that criminal sanctions on an addict for possessing or using drugs should not be imposed.

■ If the constitutional validity of a penal provision dealing with a problem of serious social impact on which there is diversity of criteria as to the wisest manner of treating the same can be upheld, it is our duty to uphold it. We must not attempt to impose our particular preference on how to solve it.

We may not agree with the manner of attacking the problem which the illegal narcotic drugs traffic represents to society. Those who have studied the problem, those with a broad knowledge of the addict's behavior, have been unable to agree on "which is" the best method. As stated by Dr. Fernández Marina at the hearing of the present case when he was asked whether the addict should be treated "as a delinquent or as a patient":

"At all times he is a patient and since, of course, there are two points of view here which must be reconciled, the point of view to protect society against a delinquent, and from the medical point of view to treat a patient. The problem is nowhere decided."

In *Reincke, supra*, it is said that:

"We are well aware of the serious difference of opinion concerning the wisdom of antinarcotics legislation seemingly so harsh as Connecticut's. But the very lack of an agreed solution argues against judicial interposition rather than for it."

■ Furthermore, our statute is not couched in the same terms of the statute considered in *Robinson*. Ours follows the uniform pattern adopted in practically all state jurisdictions. It is scientific, all-embracing, with penalties for certain acts, but at the same time with provisions for facing the problem of ill addicts. It does not make addiction, a crime.

■ Notwithstanding petitioner was criminally convicted, he testified that he is receiving group psychiatric treatment in the penitentiary. Evidently, the State has not treated him as a common criminal. He avails himself of his imprisonment to cure his illness. The law also provides for the treatment of those persons who voluntarily submit to treatment. It does not consider them delinquents. 24 L.P.R.A. § 976*l*.

The petition for habeas corpus is denied.

Mr. Justice Belaval dissented in an opinion in which Mr. Chief Justice Negrón Fernández and Mr. Justice Hernán-

dez Matos and Mr. Justice Santana Becerra concur. Mr. Justice Santana Becerra delivered a separate opinion in which Mr. Chief Justice and Mr. Justice Belaval and Mr. Justice Hernández Matos also concur.

—O—

MR. JUSTICE BELAVAL, with whom MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, MR. JUSTICE HERNÁNDEZ MATOS, and MR. JUSTICE SANTANA BECERRA concur, dissenting.

San Juan, Puerto Rico, June 30, 1965

Petitioner Rubén Martínez Rodríguez alleges: (1) That on September 15, 1961 he was sentenced by the Superior Court of Puerto Rico, San Juan Part, to from six to ten years' imprisonment in the penitentiary at hard labor, for the use of marihuana, a narcotic drug, it having been proved by the evidence introduced against him that petitioner was a drug addict; (2) that since petitioner's confinement in the state penitentiary, he has been receiving special medical treatment for his narcosis and that he has been included in and belongs to the therapy groups organized in said institution for the recovery of drug addicts; (3) that since his admission to the penitentiary and until this date he has been deprived of his liberty against his will and in violation of the Narcotics Act of Puerto Rico, which in its § 2—24 L.P.R.A. § 973a (26), p. 228—defines a drug addict as follows: "Any person who habitually uses or consumes any narcotic drug so as to endanger his own and the public morals, health, safety, or welfare, or who is so far addicted to the use of such drugs as to have lost the power of self-control with reference to his addiction." That § 59 of the Narcotics Act authorizes the Secretary of Health of Puerto Rico to provide all the necessary facilities for the treatment of drug addicts, and § 60 of the same Act provides in its paragraph (o) that: "No person submitted to the compul-

sory treatment authorized in this section shall be considered as a violator of this chapter, and the order of the court directing his commitment in an institution shall under no circumstances be deemed to be a conviction or criminal sentence." And paragraph (p) of the same section provides for special treatment to those who voluntarily submit to the court and adds that the persons who are voluntarily confined shall be subject to the same obligations imposed on persons compulsorily confined in an institution under the provisions of this section.

Petitioner continues to allege that both the evidence in his case and the allegations in the information show that petitioner is a drug addict, that is, that he suffers from an illness which is characterized by an uncontrollable compulsion to use drugs, and this being so, the trial as well as the judgment are null and void at law, inasmuch as an offense could not nor can it ever be established in the absence of criminal intention, and that his judgment would be tantamount to trying or convicting a person for suffering from cancer or tuberculosis.

He finally alleges that the Supreme Court of the United States recently overruled a case of the Supreme Court of California—*Robinson* v. *California,* 370 U.S. 660, 666, 677–78; 8 L.Ed.2d 758, 763, 769 (Stewart) (Douglas concurring) (1962), deciding: "It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and

Fourteenth Amendments. See *Louisiana ex rel. Francis* v. *Resweber*, 329 U.S. 459, 91 L.Ed. 422, 67 S.Ct. 374.

"We cannot but consider the statute before us as of the same category [insanity, leprosy, venereal disease]. In this Court counsel for the State recognized that narcotic addiction is an illness." (Stewart.)

". . . This prosecution has no relationship to the curing of an illness. Indeed, it cannot, for the prosecution is aimed at penalizing an illness, rather than at providing medical care for it. We would forget the teachings of the Eighth Amendment if we allowed sickness to be made a crime and permitted sick people to be punished for being sick. This age of enlightenment cannot tolerate such barbarous action." (Douglas.)

These are the grounds of fact and of law on which petitioner seeks his release from the penitentiary.

The information filed in the Superior Court of Puerto Rico, San Juan Part—Criminal No. G-61-548—reads as follows: "The Prosecuting Attorney files an information against Rubén Martínez Rodríguez, resident of Block N-6, Las Lomas Urbanization, Río Piedras, Puerto Rico, for a violation of § 29 of the Narcotics Act of Puerto Rico (felony), committed in the following manner: Said defendant Rubén Martínez Rodríguez, on or about April 29, 1961, in San Juan, Puerto Rico, which is part of the Superior Court of Puerto Rico, San Juan Part, illegally, voluntarily, maliciously and criminally, had in his possession and control the narcotic drug known as marihuana."

Section 29 of the Narcotics Act of Puerto Rico—24 L.P.R.A § 974z, at p. 241—which is the provision allegedly violated, states: "There is hereby absolutely forbidden the holding, possession, conveyance, use, application, prescription, manufacture, preparation, or any transfer or receipt, as well as the introduction, concealing, and transportation in Puerto Rico of:

"(1) . . .

"(2) . . .

"(3) The drug known as marihuana, as well as any liquid or solid mixture, including cigarettes or cigars of whatever form and nature containing any portion or residue of marihuana. This prohibition does not include the fiber produced from the stem of this plant, or its seeds, sterilized for industrial purposes, provided the substance or resin containing this drug has been extracted from the said fiber, and the sterilization of the seed has been achieved to a degree such as to render it incapable of germination."

The evidence introduced by petitioner at the hearing of this proceeding can be summarized thus: Petitioner testified that he had been an inmate of the State Penitentiary in Río Piedras since September 15, 1961 for a narcotics drug offense, and that when he was arrested for said offense he was an addict to marihuana, to smoking marihuana; that when he was arrested exactly four months had elapsed since his release from a hospital for drug addicts in Fort Worth, Texas; that he had been confined in that hospital because he had previously been convicted in the Federal Court of Puerto Rico (United States District Court for the District of Puerto Rico) for the offense of selling drugs; that when he went back to the hospital after having been quarantined, he was assigned a job as a dental mechanic in the hospital's dental clinic; that wall meetings were held to guide them on what they should do; that afterwards he was assigned to receive group therapy for a very long time until the doctor had the opportunity to determine how the patient had reacted. He adds that apparently he had not assimilated the treatment when he left the hospital and he went back to use the drugs while living at Las Lomas N-6, in Río Piedras; that once he left his home and went to a section called La Perla to get the drug "to use it because I needed it"; that at La Perla he saw the young fellow (the peddler) and

bought a marihuana cigarette from him; that he went to Lucila Silva Street to smoke his cigarette, and that while he was smoking Lieutenant Núñez Ortiz and a sergeant caught him by surprise; that when he saw those agents, petitioner became very nervous and threw away what he had in his hand; that "then they ordered me to stop; upon ordering me to stop the lieutenant asked the sergeant to hold me; the former then walked holding a flashlight—it was nighttime—and returned with a marihuana cigarette already lit"; "that there were about three fourths of the cigarette left because I had just lit it at that moment"; that he saw the cigarette again at the trial held at the Superior Court of Puerto Rico, San Juan Part; that during the trial the lieutenant testified "that out of four persons walking 15 feet from him, three were smoking, the other two were smoking regular cigarettes and I (the petitioner) was smoking marihuana"; that after the trial he was taken to La Princesa Jail and six days afterwards he was transferred to the State Penitentiary in Río Piedras, where he receives treatment. Doctor Efrén Ramírez visits there once a week and offers addicts group therapy, a technique which studies the adult since childhood and searches for the problem which has led them to use the drug. He says that from the largest group, composed of 250 addicts, they are promoted first to that of 40 addicts and then to one of 10 addicts, and "once in the group of 10 one can recognize his own problem, what has been the illness that has led us to the drug. After we have been in that group of 10 for a while, they find the way to transfer us to the Psychiatric Hospital"; that petitioner has belonged to the largest group, to that of the 250 addicts, for about two years; that petitioner has been using the drug since he was twelve years old; that he is not using drugs at present and has not used them for the past two years, since he started group therapy in the institution and that he used it before undertaking therapy. Petitioner claims not to know how

the drug is introduced into the jail but that it was easy for him to get it inside the jail and that he has not had a relapse during the period he has been under treatment.

The testimony of Dr. Fernández Marina, medical expert, contains a lengthy and methodical exposition of the drug addict's inner conduct. We will try to make a synthesis of said exposition: The drug addict may have different personality traits, both physical and psychological, but there is something fundamental to all of them: the compulsive craving for the use of the drug, because the anxiety and physical restlessness which dominates them is of such a nature that they cannot have any other alternative but that of obtaining and injecting the drug. This craving, this need which obnubilates any other moral, social, family and legal consideration, is unique in psychiatry. As far as is known in psychiatry, inferring the conduct of an individual from his mental processes, a drug addict lacks a clear judgment in the perception of reality which would allow him an adequate control of his conduct. An individual intervened in his psychology and his physiology, first, by the compulsion of his psychological character and second, by the toxic of a drug, cannot have control over the psychological functions which determine his conduct or govern the control of his social acts. The drug addict has regressed to a prior state of conscience, that is, his psychological functions have deteriorated in such a manner that he acts like a child. That is, he is after his own satisfaction, after that which is concrete, that which is governed by pleasure, as against the normal and reasonable adult who reaches beyond satisfaction, his security, to be accepted by his fellow men, by society. The normal conduct is one which is willing to sacrifice many satisfactions for the security of a stronghold in life. The drug addict, because of the effect of his psychological illness and because of his toxic physiologic state, could not prefer his security because the craving he feels to overcome his psychological and physio-

logical state is so urgent that even realizing that his security is at stake, he prefers satisfaction to said security. Even if he could distinguish between good and evil, he would always be compelled by the undeferrable craving to satisfy his vice. As a question of human and scientific reality, the drug addict is a sick person at all times, and it is for this reason that the outlook on the whole problem should be completely changed. To consider them as delinquents aggravates the problem of their rehabilitation, they are branded as delinquents forever, and their moral deterioration is more rapid. Discussing the aspect of propagation, Dr. Ramón Fernández Marina said that the illegal propagation of the drug is as alarming as that of an epidemic, inasmuch as the pushers are continually trying to make addicts, especially among the youngsters, to profit from them afterwards. Regarding the medical recovery of the addict, the medical expert told the court that if the drug addict is surrounded by a series of adequate circumstances, eats well and, in the case of an inter-recurrent infectious disease he is treated in due time, he might live to be sixty. As in the case of the habitual alcoholic, what kills the drug addict is the lack of food or of medical attention. The principles of fact and of law in the case at bar having been examined from the viewpoint of our local Act, we must now consider also, with special deference, the constitutional principle in *Robinson* v. *California*, of the Supreme Court of the United States. The legislative provision considered in that case is § 11721 of the California Health and Safety Code—40 West's Annotated California Codes 366 (1964)—which provides: "No person shall use, or be under the influence of narcotics, excepting when administered by or under the direction of a person licensed by the State to prescribe and administer narcotics. It shall be the burden of the defense to show that it comes within the exception. Any person convicted of violating any provision of this section is guilty of a misdemeanor and shall be sen-

tenced to serve a term of not less than 90 days nor more than one year in the county jail. The court may place a person convicted hereunder on probation for a period not to exceed five years and shall in all cases in which probation is granted, require as a condition thereof that such person be confined in the county jail for at least 90 days. In no event does the court have the power to absolve a person who violates this section from the obligation of spending at least 90 days in confinement in the county jail."

The facts considered by the Supreme Court of the United States were the following: Lawrence Robinson was accused in Los Angeles Municipal Court for a violation of the drug Act of California hereinbefore mentioned for being "a drug addict." The evidence against him consisted of the testimony of two police officers. Officer Brown testified that he had had occasion to examine appellant's arms one evening on a street in Los Angeles some four months before the trial. He noticed that the latter's left arm presented some scar tissue and discoloration and what appeared to be numerous needle marks and a scab which was approximately three inches below the crook of the elbow on appellant's left arm. The officer testified that the defendant under questioning had admitted the occasional use of narcotics. Officer Lindquist testified that he had examined appellant the following morning in the Central Jail in Los Angeles and had also observed discolorations and scabs on defendant's arms, and he identified photographs which had been taken of appellant's arms shortly after his arrest the night before. Based upon more than ten years of experience as an officer of the Narcotic Division of the Los Angeles Police Department, the witness testified that the marks and the discoloration were the result of the injection of narcotics into the tissue and into the vein with unsterile hypodermic needles; the second witness testified that the scabs were several days old at the time he examined appellant's arm, and that said defendant was neither under

the influence of narcotics nor suffering withdrawal symptoms. Policeman Lindquist also testified that defendant had admitted using narcotics in the past.

Defendant testified on his own behalf, denying the conversations with the police officers and denying that he had ever used narcotics or been addicted to them. He explained the marks on his arms as resulting from an allergic condition contracted during his military service. His testimony was corroborated by two witnesses.

The trial judge instructed the jury that the statute made it a misdemeanor for a person either to use narcotics or to be "addicted to the use of narcotics"; that the portion of the statute which refers to "use" is based upon the "act" of using and the portion of the statute referring to "addicted to the use of narcotics" is based upon a condition or "status"; that the "use" or "being addicted" are not identical or equivalent terms in meaning; that being an addict to the use of narcotics determines a "status" or condition, not an act. That the status of being an addict to the use of narcotics is a continuing offense and differs from most other offenses in that it is chronic rather than acute; that it continues after it is complete and subjects the offender to arrest at any time before he reforms. The existence of such a chronic condition may be ascertained from a single examination, if the characteristic reaction of that condition be found present. The judge instructed the jury that the defendant could be convicted under a general verdict if the jury agreed either that as a question of "status" the defendant was a drug addict, or had committed the "act" denounced by the statute.

Regarding the question submitted, the Supreme Court of the United States declared: "The broad power of a State to regulate the narcotic drugs traffic within its borders is not here in issue. More than forty years ago, in *Whipple* v. *Martinson*, 256 U.S. 41, 41 S.Ct. 425, 65 L.Ed. 819, this Court explicitly recognized the validity of that power: 'There can

be no question of the authority of the State in the exercise of its police power to regulate the administration, sale, prescription and use of dangerous and habit-forming drugs. . . . The right to exercise this power is so manifest in the interest of the public health and welfare, that it is unnecessary to enter upon a discussion of it beyond saying that it is too firmly established to be successfully called in question.' . . .

"Such regulation, it can be assumed, could take a variety of valid forms. A State might impose criminal sanctions, for example, against the unauthorized manufacture, prescription, sale, purchase, or possession of narcotics within its borders. In the interest of discouraging the violation of such laws, or in the interest of the general health or welfare of its inhabitants, a State might establish a program of compulsory [medical] treatment for those addicted to narcotics. Such a program of treatment might require periods of involuntary confinement. And penal sanctions might be imposed for failure to comply with established compulsory treatment procedures. . . . Or a State might choose to attack the evils of narcotics traffic on broader fronts also—through public health education, for example, or by efforts to ameliorate the economic and social conditions under which those evils might be thought to flourish. In short, the range of valid choice which a State might make in this area is undoubtedly a wide one, and the wisdom of any particular choice within the allowable spectrum is not for us to decide. . . .

". . . Although there was evidence in the present case that the appellant had used narcotics in Los Angeles, the jury were instructed that they could convict him even if they disbelieved that evidence. The appellant could be convicted, they were told, if they found simply that the appellant's 'status' or 'chronic condition' was that of being 'addicted to the use of narcotics.' . . .

"This statute [§ 11721 California Health and Safety Code], therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.' California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there.

". . . In this Court counsel for the State recognized that narcotic addiction is an illness. Indeed, it is apparently an illness which may be contracted innocently or involuntarily. We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. . . ."

Decisions on constitutional questions in the criminal law have a certain theoretic aspect which prevails, like a generalization extracted from a standard of superior category on the variety of the criminal circumstances of the cases. Nevertheless, there are decisions which are more compelling than others to a careful study of the grounds and of the facts in order to determine its scope.

It is unquestionable that in *Robinson*, what decides the Supreme Court to examine the constitutional offense is the fact that a citizen has been found guilty because his "status" or "chronic condition" is that of a drug addict, after it has been admitted that narcosis is a disease. The man who suffers this illness is forced to a compulsive use of the drug

which cannot be controlled by the moral convictions of exemplarity or by the social inhibitions of civility. This is, perhaps, one of those volitive decompensations created by the psychological "fear," in its strict criminal sense, which surrounds the contemporary man. It is convenient to state forthwith that the decision does not alter the system of uniform prohibition of the Model Code followed by our legislation regarding the commercial use, the purchase, sale and possession of narcotics.

The orderly reasoning of the decision can be set forth as follows: The defendant was convicted for his "status" or "chronic condition" of being a drug addict, pursuant to a statute which does not punish a person for the use of narcotics, its purchase, sale or possession, or for any antisocial or disorderly behavior resulting from the drug traffic, or even purports to provide or require medical treatment. The statutory provision comprised in this decision is that which makes the *status* or condition of being a drug addict an offense for which the addict may be prosecuted at any time before he reforms. It has been admitted that narcosis is an illness which can be acquired innocently or involuntarily. ". . . We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. . . . We are not unmindful that the vicious evils of the narcotics traffic have occasioned the grave concern of government. There are, as we have said, countless fronts on which those evils may be legitimately attacked. We deal in this case only with an individual provision of a particularized local law as it has so far been interpreted by the California courts."

Mr. Justice Douglas' concurring opinion is very useful in the interpretation of some of the outstanding points in the majority opinion. Aside from the dramatic exposition

of the problem of drugs in the human order, which covers from babies minutes old to whom tranquilizing drugs have to be administered because they were already addicted to heroin, drug used by their mothers during pregnancy, up to adults psychopathologies of decrepit addicts with the most desirable traits of the human character deteriorated, dominated by an imaginary "fear" which sometimes reaches insanity, the concurring opinion makes it clear that the constitutional provision which prohibits cruel and unusual punishment does not prevent the confinement of the addict, whether he is considered a sick person who needs treatment or a sick person who constitutes a danger to society; that in no case such confinement shall be by virtue of a criminal judgment, and any criminal judgment imposed on a drug addict interferes with his best medical treatment and rehabilitation and the practice of the judgment and confinement of a penitentiary nature should be abolished; that the only manner to face the criminogenic condition of an addict is by considering him a sick person and that any correction to benefit him or the State should be made by means of a procedure of a civil nature.

The first gloss regarding the *Robinson* case points out three results for the penal science: (1) it having been accepted that the drug addict is a sick person, any statute which provides penal sanction for addicts is unconstitutional because it violates the Fourteenth Amendment which prohibits cruel and unusual punishment: Recent Cases 111-1 U. Pa. L. Rev. 122 (1962); Notes, John E. Bagalay, Jr., 41-3 Texas L. Rev. 444, 446 (1963); Notes, Diane F. Yockey, XXXVII Tul. L. Rev. 106, 124 (1962); (2) that the fact of being a drug addict could be a valid defense in favor of the addict when he is caught "using," "possessing," or "transporting" a drug, if such operations are incidental to its use: *The Supreme Court, 1961 Term*, 76-1 Harv. L. Rev. 146 (1962); Helen Silving, *La Filosofía de la Parte Especial*

*de un Código Penal* XXXIII-I, *Rev. Jur. U.P.R.* 37 (1964);
*Recent Cases*—U. Pa. L. Rev., *supra* at 126.

Regarding this aspect of the valid defense, it would be convenient to explain the different views, because it poses a delicate problem of legal semantics and the construction of a constitutional rule which, if not analyzed with care, could lead to absurd results. Referring to the statutory prohibition on the "use" and the "proper use" sanctioned in the case of addicts we are studying, the gloss of the case which appears in Harvard Law Review, *supra* at 146, reads as follows: "The principal difference would seem to be the degree of particularity required in the indictment and the necessary proof of such matters as time and place of use. Moreover, even if the majority holding does not require elimination of use as a separate offense, it is at least arguable that it indicates that a defendant should be permitted to interpose addiction as a defense to a prosecution for use, since otherwise the state would seem to be punishing addiction indirectly." The comment published in the University of Pennsylvania Law Review regarding the "use" and other statutory prohibitions established against the "possession" or "being under the influence of narcotics" states at pp. 126–27: "If neither the illness of insanity nor the compulsive acts of an insane person may constitutionally be punished, it seems inconsistent to prohibit punishment of the illness of addiction while permitting the punishment of the addict's 'use,' 'possession,' or being under the influence of narcotics when his sole purpose is the immediate gratification of his own habit. Mr. Justice White [in his dissenting opinion] recognized the inconsistency of distinguishing the status of addiction from the addict's use of narcotics but expressed doubt that the Court [the United States Supreme Court] would forbid a state to punish such use. If, however, legal restrictions on obtaining treatment and lack of facilities effectively eliminate avenues for legitimate treatment

or satisfaction of the addict's craving, illegal possession and use would appear to be his only realistic alternative. Punishing these compelled acts is therefore equivalent to punishing the addict for addiction itself."

Dr. Helen Silving of the University of Puerto Rico, writing on the same subject for the *Revista Jurídica de la Universidad de Puerto Rico*, adds: " 'Possession of narcotics,' unless the amount possessed indicates purported sale, is another crime that deserves being jettisoned. In fact, as regards 'addicts' this is implicit in the recent United States Supreme Court decision declaring the crime of 'drug addiction' unconstitutional, if that decision is interpreted rationally with a view to its social import rather than conceptually, as a mere exercise in semantics. As regards 'non-addicts,' a criminal proscription of 'possession' not connectible with present or future use 'in public' or otherwise affecting others (corruption of others) may well be said to constitute an undue invasion of human privacy."

(3) The third result for the penal science in the *Robinson* case is the distinction established in the criminal purpose between those guilty of operating a nefarious business and the lack of guilt of the drug addicts. John E. Bagalay, Jr. stated the following in the Texas Law Review, *supra* at 447–48: "If we begin with the assumption that addiction is a disease and do not treat the addict as a criminal, then, in so far as the law is concerned, attention shifts from the addict-victim toward the conduct of those who have made a profitable business out of illicit narcotics. We do not want for legislation regulating the illegal traffic in narcotics. If the problem remains unsolved, then the difficulty lies either with ineffective enforcement of existing laws or with an inadequate approach to the problem of narcotics and drug addiction in general. While increased personnel and more rigorous enforcement of the existing narcotics laws may be called for, the results of the British efforts to control nar-

cotics indicate that this measure alone may not be the most effective solution. The British approach is to regard addiction as a disease. The addict is not compelled to search out an illegal source for his supply of drugs, but may obtain them at a minimum cost through carefully regulated medical channels. This method has the advantage of removing the stimulus for addict-crime and of linking the dispensation of drugs with medical treatment. The result in England has been both a reduction in addict-crime and the number of persons known to be addicts.

"In the principal case [*Robinson* v. *California*] the Court [United States Supreme Court] puts itself squarely in line with the British approach. The holding, further, is consistent with the conclusions reached, on the one hand, by a joint committee of the American Bar Association and the American Medical Association, and on the other, by the Senate Subcommittee on Improvements in the Federal Criminal Code [United States Senate]. The impact of the decision should be to direct the states toward both a more effective and humanitarian treatment of drug addiction, and to serve as a general warning that no state may constitutionally ignore the findings of medical science in the construction of its criminal law."

As it may be seen, the debate is today posed between the innovation of the English rule which proclaims the pathological nature of the problem, considering the drug addict as a sick person and even legalizes the illicit traffic of drugs to prevent the crimes committed by the addicts while they are suffering the terrible craving for the drug, and the orthodox rule which proclaims the volitional nature of the act, viewing the drug addict as a delinquent and also accepts as its best solution the severity of the police. In his concurring opinion in the *Robinson* case, Mr. Justice Douglas accepts the wisdom of the English rule and in this case, Dr. Ramón Fernández Marina, our medical expert, recom-

mends as the principal solution for the control of the propagation of the vice and for the rehabilitation of the addicts, the legalization of the illicit traffic of narcotic drugs.

The immediate precedent of the prohibition of the liquor industry, with its impressive complex of high criminality, seems to indicate that the only effective form of dealing with the contemporary problem of narcotics is the total legalization of the illicit business, just the way it was done in the case of the liquor industry. Otherwise, we shall always be exposed to the maximum risk of forty thousand addicts for each generation, a problem which, because of its magnitude, is capable of disorganizing the entire educational, sanitary, or police structure of our State. The medical evidence shows that while the addict has not obtained the drug, he is in a vehement state of criminogenic fury or under the depression of dense psychological fear, during which he is capable of committing any crime, unless he is able to compensate the volitive deficiency by using the drug. As we all know, the contemporary criminal science is starting to consider "fear" as an excuse of criminal guilt, as a new freedom from guilt, because when the social cloister of man gets dim, the luminous attributes of human reason weaken and there is a regression to natural terror. After taking the drug, he develops an euphoria which even though it does not constitute the best balance of the orderly and reflexive conduct, at least controls the criminogenic latencies and frees from "fear," from that deerlike fear, this misgiving created in the conscience of young men by the mystic of the "robot."

In the case of Puerto Rico, such legislation is fraught with difficulties because of the extraterritorial expanse given by our present association with the United States of America. Because of the nature of the problem there are involved here State policies which transcend the limits of our judicial authority and which should be referred to the legislative authority of our people; but there are always those aspects

which are irremissibly ours, like that of determining whether the imposition of a sentence violates the human deferences of our constitutional institution.

During the hearing of the appeal at bar it was clearly established that petitioner was, a drug addict at the time he was sentenced, he was a recurrent addict and, therefore, he should have been considered as a sick person and not as a delinquent, not only because of the doctrinal results of the constitutional question examined, but also because of the express provision of § 60 (o) of Act No. 48 of June 18, 1959, known as the Narcotics Act of Puerto Rico, which provides: "No person submitted to the compulsory treatment [for being a drug addict] authorized in this section shall be considered as a violator of this act, and the order of the court directing his commitment in an institution shall under no circumstances be deemed to be a conviction or criminal sentence."

The fact that he was sentenced as a delinquent might have obeyed the predominant criterion that having in his "possession" the narcotic drug known as marihuana made him a violator of § 29 of our Narcotics Act, which prohibits the possession of said drug without specifying or distinguishing between the "possession" for *another's use* for the purpose of illicit profiteering within the clandestine drug traffic and the possession for personal "use" which the addict incidentally acquires. The gloss we have examined regarding the *Robinson* case has convinced us that a difference between "use" and "possession" should be established, whether it constitutes a pathological status or an intentional act of the drug addict, and the "use" or "possession" of the drug peddler. As it has been stated by commentators, to punish an addict for the possession or for any other act incidental to his pathologic urgency is to punish him, indirectly, for being an addict, a habitué without any possible control of his criminal intention, a sick person.

It should be clear that when the evidence establishes that the defendant is a drug addict, any possession or control of a narcotic for his own use does not constitute a violation of § 29 of the Narcotics Act of Puerto Rico which refers to the drug peddler who operates on other people and yet it allows cause for the special judicial proceeding for addicts of § 60 of the same Act which refers to the use of the narcotic by the addict himself. We understand the difficult situation which, in some cases, may be created by the necessity to determine whether it is a possession for the purposes of the illicit traffic or for the addict's own personal use. But such difficulty can be obviated by virtue of the special investigations made by undercover agents or by a more methodical discovery of the circumstances surrounding each case.

The same can be said regarding the special confinement provided by § 60. Although such special confinement requires a type of commitment different from that provided by our jail system, we do not believe it difficult to isolate a section of our penitentiaries or to establish a dispensary service for those cases which could be treated by means of a reduced dose for the purpose of enforcing the law. It seems that certain pessimism exists concerning the low percentage of rehabilitation of adults; but this is such a complex matter that, the lower the rate of rehabilitation, the higher the rate of crime prevention will be and, therefore, it is more urgent to provide for the special confinement required by § 60. At any rate, this aspect of the problem is beyond our control.

For the foregoing reasons, the criminal judgment entered by the Superior Court of Puerto Rico, San Juan Part, in case G-61-548 is set aside and said court is ordered to hear the case again under the provisions of § 60 of the Narcotics Act of Puerto Rico.

.     .     .     .     .     .     .     .

The foregoing is the opinion which did not meet with the Court's approval. We notice that in order to reach a dif-

ferent conclusion the judge considered the evidence introduced at the trial prior to the habeas corpus proceeding and not the facts presented in the habeas corpus, which are the only ones to be considered in this opinion: *Fay* v. *Noia*, 372 U.S. 391, 423, 425, 9 L.Ed.2d 837, 859, 860 (Brennan) (1963). This is the most recent reliable doctrinal exposition on the procedural independence of the writ of habeas corpus from any prior criminal proceeding. A rather incomplete marginal notation on the facts proved during the habeas corpus hearing does not erase the dramatic impact of the first recital of the facts contained in the opinion. Nevertheless, if the fact of possession is established in the first hearing, within the meaning it has in illicit drug traffic, at the hearing of the habeas corpus what is established is the categoric fact that petitioner is an addict, within the meaning it has in the Model Code and the special confinement provided by § 60 of the Narcotics Act of Puerto Rico.

We also notice that great part of the case law cited by the judge is not in accordance with the Model Code, the one which governs in Puerto Rico—for example—*Browne* v. *State*, 129 N.W.2d 175, 179 (Wilkie) (1964); *State* v. *Brown*, 130 N.W.2d 760, 761 (Hallows) (1964); *Salas* v. *State*, 365 S.W.2d 174, 175 (Morrison) (1963), where it was decided, as against the thesis sustained by the majority, that an addict cannot be convicted under the Drug Act; *Ex Parte Rogers*, 366 S.W.2d 559, 560 (Woodley) (1963), where it was also decided, against the majority, that an addict cannot be convicted under the Drug Act; *People* v. *Davis*, 188 N.E.2d 225, 226, 227 (Klingbiel) (1963) decides that a statute which considers punishable being under the influence of drugs, or being a drug addict, is unconstitutional; *Martínez* v. *State*, 373 S.W.2d 246, 247 (Woodley) (1963); *State* v. *Margo*, 191 A.2d 43, 44, 45 (Per Curiam) (1963). The only cases which seem to be in agreement with the Model Code, which establishes differences between ped-

dlers and addicts, and which prevails in Puerto Rico, are the following: *Murray* v. *State*, 203 A.2d 908, 911 (Horney) (1964) is a case of sale of heroin in illicit common traffic in which the distinction is made that if the person were an addict he could not be punished, although he could be confined for treatment, just like in Puerto Rico; *State* v. *DaVila*, 183 A.2d 852, 854 (Murphy) (1962) is a case of the sale of heroin in the illicit common traffic in which the distinction is also made that if he were an addict he could not be punished although he could be confined for treatment, just like in Puerto Rico; *State* v. *Walker*, 154 So.2d 368, 372 (Hamiter) (1963); *State* v. *James*, 169 So.2d 89, 92 (Sanders) (1964) is not a case of addiction but one of an ordinary peddler (possession), which mainly turns out to be a case of illegal search; *State* v. *Bridges*, 360 S.W.2d 648, 651 (Holman) (1962) holds that a criminal provision which punishes for being an addict is unconstitutional.

The result of this rather arbitrary doctrinal exposition is clearly negative: Over the provisions of our Act No. 48 of June 18, 1959, known as the Narcotics Act of Puerto Rico, a drug addict, a sick person, will continue to serve a criminal sentence expressly prohibited by our law.

—O—

Separate opinion of MR. JUSTICE SANTANA BECERRA, with whom MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, MR. JUSTICE BELAVAL, and MR. JUSTICE HERNÁNDEZ MATOS concur.

San Juan, Puerto Rico, June 30, 1965

Act No. 48 of June 18, 1959, called the Narcotics Act of Puerto Rico, contains in its § 60—24 L.P.R.A. § 976*l*— a civil proceeding in the Superior Court filed by the Secretary of Health for the confinement and isolation of the narcotic drugs addicts from society.

As far as we know that civil proceeding is not being used and, if it has been used, it has not been within the minimum degree necessary to meet the medico-social problem of drug addiction.

On the contrary, the drug addict who is caught with the charred bottle top containing residues of heroin, the needle, and the dropper, or the one caught euphoric, trying to imbibe rather than smoke, a marihuana cigarette, has been treated as an ordinary criminal under the provisions of § 29 of the Act.

It is true that the conviction isolates the addict from community life and that while he is serving his sentence he receives treatment against addiction within the limitations of a penitentiary, but the person is isolated not as a sick person would be under the civil proceeding of § 60, but with the indignity of a criminal conviction and all its other consequences. If the medical science avers that a drug addict is a sick person, it is not necessary to have either a constitutional provision inflicting a cruel and unusual punishment, or a judgment, *Robinson* v. *California,* 370 U.S. 660, for a people to conclude from an innate sense of social culture, that that addict should not be branded as a criminal.

The evidence introduced in the habeas corpus has convinced me that we have here the case of a drug addict. If it is so, as I believe it is, let us see what medicine says. The prominent psychiatrist, Dr. Ramón Fernández Marina, testified, answering a question in relation to the characteristics presented by drug addiction:

"Well, the drug addict may present different types of physical as well as psychological personality, but there is something fundamental in all of them that after they experience the effect of the . . . in these general cases it is heroin, they may start with morphine, or Dilaudid, the marihuana, etc., and when they fall in the clutches of heroin, which is the most horrible of all of them, the characteristic it presents is a compulsive craving

to use the drug because the anxiety and physical restlessness suffered is of such a degree that they do not, they cannot consider any other thing but obtaining and injecting the drug in them. That is, this compulsion, this need to . . . terribly demanding from all . . . and obnubilating of all moral, social, family, legal consideration of any kind which the drug addict has, is unique in psychiatry. That is, among persons who are not psychotic and in many cases we have seen that drug addiction is just dissimulating a psychosis, a schizophrenia; and as schizophrenia is the sensation of not being, of not belonging, of not feeling human, then, they resort to drugs to escape facing reality."

Further on, answering the question as to whether the addict can control his acts in relation to the drug:

". . . But as far as we know in psychiatry when we infer the behavior of an individual from his mental processes, a drug addict cannot have a clear understanding of his perception of reality leading to the proper control of his behavior. I mean to say by this that the judgment, the act of judging, of being a judge, the judging of an act is the supreme ability of the human being. In the evolution of the psyche the last thing to be developed is the rare ability to judge. That is why the function of the judge in society is the most dignified. And these persons who are affected in their physiology and in their psychology, first by the compulsion in their psychological disposition and second by the toxicity of the drug, evidently cannot exert control over the psychological functions which determine their behavior and determine the control of their social actions. Therefore, the answer is no."

"Judge Belaval:
    "Could they distinguish between good and evil?
    "Yes and no.
    "Which are the circumstances conditioning their behavior?
    ". . . The drug addict, due to the effect of his psychological illness and his toxic-physiologic condition does not consider his security, he considers his satisfaction because, compulsively, he has, like a child, to look for that satisfaction to feel calm. A baby, a child, does not care whether he is sick with diabetes, for example, he takes sugar because he does not have the knowl-

edge that dieting provides a security for living, and although sugar is harmful to him, that child, as his judgment is so infantile, we should say, he takes the sugar. It is the same with the drug addict, his need to escape from his psychological and physiological condition is so powerful that, although he may know that his security is in danger, his satisfaction prevails over his security; because of this illness he cannot postpone satisfaction to security. Therefore, if that is the psychological and physiological condition of the individual, it makes no difference whether or not he can distinguish between good and evil because compulsively he has to bend to his satisfaction."

"Mr. Cruz:

"Can a person, under the circumstances of drug addiction you have just explained, be considered a sick person, doctor?

"Why, sure, that is what I am trying to say, that it is a case of psychopathology and physiopathology. Pathology means illness."

Further on, answering the question as to whether behavior is consistent with a determined plan:

"Yes, evidently during a specific period the addict graduates the need for the use of the drug, but then the physical condition for the physical need of the drug disappears because at first it is a psychological need, and as intoxication progresses and the metabolism becomes involved, the chemical reactions in the liver and the nervous system are involved, then it becomes a physiological need. At first it is psychological, and later it is psychophysiological. That is, that as it gets worse, more and more is needed."

". . . So that, if we observe the behavior of a drug addict from that point of view we shall see that he is psychologically and physiologically sick, but that he is a unit called a human being functioning inadequately."

According to the medical science represented here by the eminent professional, Dr. Fernández Marina, petitioner is a sick person. His need is so irresistible, at first psychological and as the intoxication progresses, psychophysiological, which ensnares him to the drug, and the bond is so powerful that when the patient is confined as a criminal, as is usually done,

the drug, in manifold ways breaks the barriers of confinement and reaches him.

The opinion of the Court gives much emphasis and importance to the facts in the decision in *Robinson*, which are obvious and nobody questions, and which would be thus even if the opinion in *Robinson* had not been rendered; that the United States and, in our case, Puerto Rico, has the power to persecute criminally and declare the possession, use, traffic, etc., of narcotic drugs, a crime. *Robinson* is more transcendental than that, and although it was a California statute punishing addiction as such which produced that decision, which statute does not exist here, the transcendency of *Robinson* is not limited either to such situation where there exists a statute like the one annulled in California.

*Robinson* is of significance wherever it is sought to punish criminally what appears to be a disease. The disease is punished whenever the use and possession, as a manifestation of the illness, are punished. We would be ignoring the opinion of medical science by failing to understand that that use and possession is the very irresistible psychological and psychophysiological impulse which, as the physician stated, binds the sick person to the drug.

In view of the seriousness of the problem, which has become of deep concern to the different spheres of opinion in our society, it seems to me that the Court should reach the very bottom thereof, which is not solved by merely making a legal analysis of the decision in *Robinson* and its doctrinal procedure.

The problem is not solved by making the sick person a criminal. Although the Court by itself is not authorized to provide the treatment or to offer the cure, it certainly can establish the juridical pattern to serve as a guide in the solution of the problem.

I am not holding that § 29 of the Narcotics Act is unconstitutional. But in the function of the Court in constru-

ing a law I understand that it should be construed in the sense that the use and possession stated therein does not include, under pain of illegality, the use or possession by an addict for the mere satisfaction of psychological and physiological need which, were it not for his illness, he would not require.

For the reasons stated by my brother, Mr. Belaval, in his dissenting opinion with which I concur in full, and for the reasons stated above, I dissent. I believe petitioner should remain isolated from the community until after his recovery, but not under a criminal sentence, which should be set aside.